In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-1786

SABRI I. SAMIRAH,

*Plaintiff-Appellee,*

*v.*

CYNTHIA J. O'CONNELL, INTERIM
DISTRICT DIRECTOR FOR INTERIOR
ENFORCEMENT, BUREAU OF IMMIGRATION
AND CUSTOMS ENFORCEMENT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1298—**James B. Moran**, *Judge.*

ARGUED JUNE 5, 2003—DECIDED JULY 2, 2003

Before FLAUM, *Chief Judge*, and COFFEY and MANION,
*Circuit Judges.*

MANION, *Circuit Judge.* After the government revoked
the advance parole of Sabri Samirah, an alien, the district
court ordered advance parole to be reinstated. Because
that order exceeded the district court's jurisdiction, we
reverse.

I.

Sabri Samirah is a Jordanian citizen who first entered the
United States in September 1987 on a student visa. Accord-

ing to the government, however, Samirah did not comply with the terms of his visa. At some point he dropped out of school and out of lawful immigration status for more than two years. Years of legal battles between Samirah and the government ensued. We examine that long legal history only insofar as it is relevant to the narrow issue before us.

In 2002, Samirah, who was still classified as an alien, filed a request for advance parole, stating that he intended to travel abroad for approximately two weeks in May 2003. (Advance parole, as we shall explain in detail later, is basically permission for a resident alien to reenter the United States after departing for some stated purpose.) The Immigration and Naturalization Service (INS)[1] approved this application, pursuant to 8 U.S.C. § 1182(d)(5), in December 2002. Samirah then departed the United States on December 28, 2002, which was about four months earlier than he had represented to the INS. On January 17, 2003, while Samirah was abroad, the District Director of the Chicago INS Office, acting on behalf of the Attorney General, revoked his advance parole because the INS had received information that he was a "security risk to the United States." On January 18, 2003, the INS served this revocation on Samirah at its pre-inspection station in Shannon International Airport, Ireland. It also concluded that, because Samirah had more than one year of unlawful presence in the United States and lacked a valid

---

[1] On March 1, 2003, the INS ceased to exist as an independent agency within the United States Department of Justice, and its functions were transferred to the newly-formed Department of Homeland Security. *See* 79 Interpreter Releases 1777, 1777 (2002). The transition is irrelevant for our purposes and, for ease of use, we shall refer to the INS throughout this opinion.

travel document, he was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i). With no advance parole and no documents (e.g., a visa) that would allow his entry into the United States, Samirah returned to Jordan. Although it is not clear from the record where Samirah resides at the moment, one thing is certain: he is not in the United States. This is particularly disturbing to Samirah because his children are all citizens of the United States who reside in this country, and his wife is a non-citizen who also resides here.

On February 20, 2003, Samirah's attorney filed an action in the district court seeking, among other things, injunctive relief requiring the government to allow his return to the United States. He asserted jurisdiction under Article I, § 9 of the Constitution and various federal statutes, including 28 U.S.C. § 2241, which provides to federal courts the general power to grant the writ of habeas corpus. The district court issued an injunction requiring the government to allow Samirah's return, reasoning that "the only thing we conclude is that the government cannot short-circuit the rights of an alien who has long lived in the United States by revoking his parole and then treating him as if he had never been here at all." The government appeals, asserting, among other arguments, that the district court lacked jurisdiction.

II.

To understand this case, we first need to examine the function that parole plays in our system of immigration law. The Attorney General[2] has the discretion to "parole"

---

[2] During the period when Samirah's advance parole was revoked, the Attorney General had delegated his parole authority to his

(continued...)

aliens into the United States. 8 U.S.C. § 1182(d)(5)(A) (2000). Parole allows an alien temporarily to remain in the United States pending a decision on his application for admission. *Id.* § 1182(d)(5). Although a paroled alien has "liberty to roam the country," the law considers him legally detained at the border within the government's custody until his immigration status is determined. *Chavez-Rivas v. Olsen*, 207 F. Supp. 2d 326, 328 (D.N.J. 2002). In some cases (this is one of them), the Attorney General grants advance parole to an alien who is already in the United States but who also wants the assurance that he will be allowed to leave and return. *Assa'ad v. United States Atty. Gen.*, ___ F.3d ___, 2003 WL 21282457, at *3 (11th Cir. June 5, 2003); 5 Charles Gordon, et al., Immigration Law and Procedure § 62.02[2], at 62-13 (Rev. ed. 2003). The Attorney General also has the discretion to revoke advance parole after it has been granted. 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i). After determining that Samirah was a security risk, the Attorney General exercised that discretion and revoked his advance parole.

The district court, however, reversed the decision to revoke parole and candidly determined that a parole

---

[2] (...continued)
INS district directors. *See* 8 C.F.R § 212.5 (2002). In this case, as discussed above, the actual decision to revoke parole was made by the District Director of the Chicago INS Office, Brian R. Perryman. We nonetheless refer to the "Attorney General" as exercising this discretionary authority because, as far as the law is concerned, district directors act as the Attorney General's surrogate when exercising the discretionary authority that he has delegated to them. *See Parra v. Perryman*, 172 F.3d 954, 957-58 (7th Cir. 1999) (discussing the "Attorney General's" discretionary decision to detain an alien pending removal, even though District Director Perryman was the named respondent).

revocation could not have the legal effect of destroying whatever rights Samirah had to contest removal. The district court thought it a "judicial responsibility" to require the executive branch to adhere to its obligations. It thus concluded that "the government cannot short-circuit the rights of an alien who has long lived in the United States *by revoking his parole* and then treating him as if he had never been here at all," (emphasis added) and it then ordered the government to allow Samirah's return.

We must determine whether federal courts have subject matter jurisdiction to review discretionary decisions of the Attorney General, such as the decision to revoke parole. We review *de novo* the existence of subject matter jurisdiction. *Iddir v. INS,* 301 F.3d 492, 496 (7th Cir. 2002). First, we examine Congress's jurisdictional grant in the non-habeas context. The government cites 8 U.S.C. § 1252(a)(2)(B)(ii) for the proposition that Congress has divested federal courts of such jurisdiction. Section 1252(a)(2)(B)(ii) provides as follows:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law, no court shall have jurisdiction to review— . . .
>
> (ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under section 1158(a) of this title.

The authority for the Attorney General to grant and revoke parole stems from § 1182(d)(5),[3] a provision that

---

[3]   8 U.S.C. § 1226 also allows the Attorney General to grant or revoke parole in cases in which an alien has been detained, but that

(continued...)

is "specified under" the "subchapter" mentioned in
§ 1252(a)(2)(B)(ii) . (Subchapter II of Chapter 12 of Title 8,
includes §§ 1151-1378.) The exercise of that authority is,
as we mentioned earlier, a matter of the Attorney Gen-
eral's discretion. Hence, argues the government, the plain
language of § 1252(a)(2)(B)(ii) precludes jurisdiction.
Samirah, apparently relying on the fact that § 1252 is
titled "Judicial review of orders of removal," argues that
the provision is inapplicable because "there is neither a
removal order nor [are there] removal proceedings in
this case." Some district courts have taken this position,
holding that § 1252(a)(2)(B)(ii) is limited to discretionary
decisions made within the context of removal proceedings.
*See, e.g., Talwar v. INS*, 94 F. Supp. 2d 1120, 1124 (D. Or.
2000); *Shanti v. Reno*, 36 F. Supp. 2d 1151, 1159 (D. Minn.
1999).

We, however, disagree. "[T]he heading of a section
cannot limit the plain meaning of the text." *Brotherhood
of Railroad Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519,
528-29 (1947). The plain meaning of § 1252(a)(2)(B)(ii)'s
text is that "no court shall have jurisdiction to review" any
decision of the Attorney General to deny discretionary
relief "specified under this subchapter." We therefore
join two of our sister circuits and a number of district
courts in holding that § "1252(a)(2)(B)(ii) is not limited
to discretionary decisions made within the context of
removal proceedings." *CDI Information Servs. Inc. v. Reno*,
278 F.3d 616, 620 (6th Cir. 2002); *accord Van Dinh v. Reno*, 197
F.3d 427, 434 (10th Cir. 1999); *El-Khader v. Perryman*, No. 02
C 984, 2003 WL 1790862, at *3 (N.D. Ill. Apr. 2, 2003);

---

[3] (...continued)
is irrelevant to this case because the INS expressly relied on
§ 1182(d)(5) and because it did not detain Samirah.

*Systronics Corp. v. INS*, 153 F. Supp. 2d 7, 11 (D. D.C. 2001); *Avramenkov v. INS*, 99 F. Supp. 2d 210, 214 (D. Conn. 2000). Because the Attorney General's decision to grant or revoke parole is squarely within the ambit of § 1252(a)(2)(B)(ii), we hold that the district court lacked jurisdiction to review, much less reverse, the revocation of Samirah's parole—at least outside the context of a habeas proceeding.

Samirah alleges habeas jurisdiction under 28 U.S.C. § 2241, and contends that § 1252(a)(2)(B)(ii) does not preclude a court from granting the writ. There is authority for the proposition that, pursuant to *INS v. St. Cyr*, 533 U.S. 289 (2001), § 1252(a)(2)(B)(ii) should not be construed as stripping federal courts of habeas jurisdiction over challenges to the INS's parole determinations. *See Sierra v. INS*, 258 F.3d 1213, 1217 (10th Cir. 2001); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1374 (S.D. Fla. 2002). *But see Curri v. Reno*, 86 F. Supp. 2d 413, 421 (D. N.J. 2000) (holding, without the benefit of the Supreme Court's opinion in *St. Cyr*, that § 1252(a)(2)(B)(ii) repeals habeas jurisdiction). Nevertheless, § 1252(a)(2)(B)(ii)'s effect on habeas jurisdiction is an issue that we need not address today. The district court lacked jurisdiction under § 2241 for at least two reasons, neither of which involves § 1252(a)(2)(B)(ii). The first reason is that Samirah was not in custody when he filed this case. The second is that, even if he could somehow be considered to have been in custody, the district court would still have lacked jurisdiction over his custodian.

Federal courts have jurisdiction to issue writs of habeas corpus under § 2241 only where the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c); *Williams v. Chrans*, 894 F.2d 928, 937 (7th Cir. 1990). Although the word "custody"

is elastic, all definitions of it incorporate some concept of ongoing control, restraint, or responsibility by the custodian. *See* Black's Law Dictionary 384 (6th ed. 1990). In the context of *Miranda* warnings, for example, a suspect is in custody only if a reasonable person in his position would not believe that he was free to leave. *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998). Samirah's problem is not that he lacks freedom to *leave*; Samirah's problem is that, by dint of the government's revocation of his parole and his lack of the proper documents, he is not free to *return*. But the United States is exercising no ongoing control, restraint or responsibility over him. As far as the government is concerned, Samirah may wander the earth, so long as his wanderings do not lead him to the United States. Samirah is, in some sense, re-strained insofar as he cannot enter the United States. But that restraint, such as it is, only puts him on par with the billions of other non-U.S. citizens around the globe who may not come to the United States without the proper documentation.[4] Nevertheless, Samirah does point to one authority that could be read as construing § 2241 jurisdiction to encompass such people.

Samirah quotes *Jones v. Cunningham*, 371 U.S. 236 (1962), to the effect that the Supreme Court "has repeatedly held that habeas corpus is available to an alien seeking entry into

---

[4] We recognize that Samirah, like many aliens seeking entry to this country, has family in the United States. Although we are sympathetic as to why that raises the stakes for him, we know of no authority for the idea that having family in the United States changes the analysis of custody. We also note, moreover, that he finds himself in that position because he lived here for many years, often with dubious authority. During that time he made what was, at best, a series of half-hearted attempts to improve his immigration status.

the United States, although in those cases each alien was free to go anywhere else in the world." *Id.* at 239. Taking that statement out of context, it would be reasonable to infer that all aliens seeking entry into the United States, regardless of their otherwise unfettered mobility *outside* of this country, are in United States custody. The Ninth Circuit, albeit with little analysis, has interpreted *Jones* as standing for the proposition that, by itself, "denial of entry amounts to a restraint on liberty" sufficient to constitute custody for purposes of § 2241. *See Subias v. Meese*, 835 F.2d 1288, 1289 (9th Cir. 1987).[5]

We disagree with the Ninth Circuit's construction of *Jones* because, when interpreted as a whole, *Jones* does not support such a broad conclusion.[6] The *Jones* Court qualified the sweeping statement that Samirah quotes by noting that "custody" requires at least some restraint that is "not shared by the public generally" and that such restraints had "been thought sufficient in the English-speaking world to support the issuance of habeas corpus." *Jones*, 371 U.S. at 240. Thus, a proper reading of *Jones* leads to the conclusion that an alien abroad who seeks entry into the

---

[5] *Subias* involved a fugitive from United States prosecution who claimed to be "in custody" in his native Mexico and, because he was denied entry to the United States, also claimed that he was entitled to habeas relief. Based on *Jones,* the Ninth Circuit acknowledged that custody is broadly construed to include restriction from entry into the United States, but denied habeas relief on the ground that there was no jurisdiction over any custodian.

[6] Because this opinion creates a split between circuits, we circulated it in advance of publication to the judges of the court in regular active service, pursuant to Seventh Circuit Rule 40(e). None voted to hear the case en banc.

United States must, at the very least,[7] suffer some unique restraint that would, in light of historical precedent, constitute custody for the purposes of habeas jurisdiction. *See id.*

Samirah does not clear that hurdle. Neither of the two cases he cites is precedent for a court to exercise habeas jurisdiction over an undocumented alien merely because that alien was refused entry into the United States. In *Arias v. Rogers*, 676 F.2d 1139, 1142 (7th Cir. 1982), we held that an alien released on bond pending deportation proceedings was in custody, and in *Flores v. INS*, 524 F.2d 627, 629 (9th Cir. 1975), the Ninth Circuit held that an alien released on his own recognizance during a departure period was likewise in custody. There is, of course, substantial authority for the idea that a person released on bond, or on his own recognizance, is "in custody" for purposes of habeas jurisdiction. 26 A.L.R. 4th 455, § 3(a) (1983). But Samirah is not released on bond, or his own recognizance, and so his case is easily distinguished from both *Arias* and *Flores*.

We further note that Jones himself was a United States citizen, and that not one of the four cases the *Jones* Court

---

[7] Although we need not address the issue today, we note that it is not clear that federal courts may exercise extraterritorial jurisdiction over an alien bringing a habeas petition. *Compare Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950) (observing that "in extending constitutional protections beyond the citizenry the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary the power to act"), *and Gherebi v. Bush*, ___ F. Supp. 2d ___, 2003 WL 21180433 (C.D. Cal. 2003) (holding that a district court lacks habeas jurisdiction over aliens detained outside U.S. territory), *with Ahmed v. Department of Homeland Sec.*, 328 F.3d 383, 385-87 (7th Cir. 2003) (holding that the district court had jurisdiction over the petition for the writ of mandamus of an alien abroad).

cited for the proposition that it had "repeatedly held that habeas corpus is available to an alien seeking entry into the United States, although in those cases each alien was free to go anywhere else in the world" proves analogous to Samirah's situation or supports the proposition that there may be habeas jurisdiction over an alien abroad merely because he was refused entry. *See Jones*, 371 U.S. at 239 (citing *Brownnell v. Shung*, 352 U.S. 180, 183 (1956); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950); *United States v. Jung Ah Lung*, 124 U.S. 621, 626 (1888)). In *Brownell*, the alien brought a declaratory action under the Administrative Procedure Act in order to challenge an order of deportation; he did not bring a habeas action. *Brownell*, 352 U.S. at 182-86. In *Mezei*, the alien was detained by the government, and effectively imprisoned on Ellis Island, because the United States had permanently excluded him on security grounds and no other country was willing to accept him. *Mezei*, 345 U.S. at 207. In *Knauff*, a case in which the Court did not discuss jurisdiction, the alien was likewise "detained at Ellis Island." *Id.* at 539. In *Jung Ah Lung*, the alien was detained by the master of a steamship under color of federal law (the Chinese Restriction Act), and was therefore considered to be in federal custody for purposes of habeas jurisdiction. *Jung Ah Lung*, 124 U.S. at 626. None of these cases even remotely supports the idea that an alien abroad who is denied entry is, for that reason alone, in United States custody.

Samirah is a Jordanian citizen (apparently) living in Jordan. He is also a person over whom the United States exercises no control or responsibility, and who (as far as the government is concerned) is free to travel the world. Nevertheless, Samirah contends that he is in federal custody. We disagree with Samirah's argument be-

cause (1) it stretches the word "custody" beyond what the English language or logic will bear, and (2) legal authorities do not support it. We therefore hold that the district court lacked jurisdiction over Samirah's § 2241 petition.

There is an also an alternate ground for our holding that the district court lacked § 2241 jurisdiction. If Samirah is to proceed under § 2241, he must name his custodian as respondent and file the petition in a district court that has jurisdiction over his custodian; otherwise, the district court would lack jurisdiction. *Montenegro v. United States*, 248 F.3d 585, 594 (7th Cir. 2001), *overruled on other grounds by Ashley v. United States*, 266 F.3d 671, 674-75 (7th Cir. 2001). The custodian, in most cases, "is the person having a day-to-day control" over the petitioner, because he "is the only one who can produce 'the body' of the petitioner." *Guerra v. Meese*, 786 F.2d 414, 416 (D.C. Cir. 1986) (holding that the Parole Commission was not the custodian despite its power to release the petitioner). Samirah has named Cynthia J. O'Connell, Interim Director for Interior Enforcement at the Bureau of Immigration and Customs Enforcement, as the respondent. Yet it is clear that neither she, nor any other governmental official, has "day-to-day" control over, or can produce, Samirah. Samirah is free, we emphasize once again, to travel the world at his leisure. Because O'Connell lacked control over Samirah at the time his § 2241 action was filed, she was not his custodian.

We note that there may be limited circumstances in which the United States holds a prisoner abroad (and there is thus no domestic forum where the custodian is present) in which a petitioner may be allowed to file a habeas action in a district where *someone* with control over his body is located. For example, in *Ex Parte Hayes*, 414 U.S. 1327 (1973), a soldier on active duty in Germany

filed a petition for a writ of habeas corpus directly with Justice Douglas. *Id.* at 1328-29. Justice Douglas reasoned that, although the serviceman's immediate commanding officer was outside the territorial limits of any district court, others in his chain of command were not. *Id.* The Secretary of the Army, for example, was located within the jurisdiction of the District Court for the District of Columbia. Justice Douglas therefore transferred the case to that court. *Id.* In the unusual circumstances of that case, an extraterritorially-detained petitioner had access to the writ in the District of Columba.

Even in *Hayes*, however, the "custodian" located in the District of Columbia could physically produce the body to the district court. That is not so in this case. Here, neither the named respondent, nor anyone else in the federal government (much less someone physically present in the Northern District of Illinois), could produce the body. We hold that no custodian was within the district court's territorial limits when this case was filed, and that court therefore lacked habeas jurisdiction. *See Subias*, 835 F.2d at 1289 (holding that jurisdiction did not exist because the petitioner's location abroad and custodian were unknown and, therefore, no governmental official could produce the body).

## III.

The district court lacked jurisdiction over Samirah's § 2241 petition because he was not in custody and because it lacked jurisdiction over his putative custodian. Section 1252(a)(2)(B)(ii) bars jurisdiction over of the rest of Samirah's action. The latter holding once again drives home the point that federal courts are courts of finite jurisdiction, jurisdiction that Congress delineates. *See*

*Aldinger v. Howard,* 427 U.S. 1, 15 (1976). Section 1252(a)(2)(B)(ii) makes clear that one of the subjects beyond any statutory grant of jurisdiction, at least outside the context of a habeas proceeding, is review of the Attorney General's discretionary decision to revoke parole. Because the district court lacked the jurisdiction to reinstate Samirah's advance parole, we reverse.

REVERSED.

A true Copy:

      Teste:

                                    _____

                                 *Clerk of the United States Court of Appeals for the Seventh Circuit*